### In re COPE.*

### In re CHILTON.
### Nos. 8068, 8074.

District Court, D. Colorado.
Nov. 17, 1934.

---

*Affirmed on rehearing 8 F. Supp. 961.

In No. 8068:

Albert Dakin, of Longmont, Colo., for Charles Francis Cope.

Twitchell, Clark & Burkhardt, of Denver, Colo., for C. G. Christoffers.

In No. 8074:

J. Emery Chilton, of Denver, Colo., for James William Chilton.

William E. Hutton and John F. Pierce, both of Denver, Colo., for Central States Life Ins. Co.

James R. Hoffman, of Denver, Colo., for John R. Walker, creditor.

SYMES, District Judge.

These two cases involving the constitutionality of the so-called Frazier-Lemke Amendment to the Bankruptcy Act (11 USCA § 203 (s) have, by consent, been consolidated and argued at the same time upon agreed statements of fact. In No. 8074, James William Chilton, debtor, is now the owner of real estate in Weld county, Colo., known as the "Seventy Ranch," consisting of 12,000 acres. On July 3, 1934, the Central States Life Insurance Company, holder in due course of a note for $50,000, dated December 29, 1924, executed by the Harvester Investment Company, and secured by a mortgage on this ranch, commenced foreclosure proceedings thereunder in the state district court for Weld county. Chilton, on July 26, 1934, filed a petition under section 75 (11 USCA § 203) for composition of debts. Said petition was referred to the conciliation commissioner of Weld county, and proceedings had thereunder. The debtor's plan of com-

position was rejected by a majority in amount of creditors on September 28, 1934.

The debtor thereupon filed an amended petition, seeking permission to proceed under section 75 (s), the so-called Frazier-Lemke Act (11 USCA § 203 (s), and was adjudicated a bankrupt on October 10, 1934. On the day following, October 11, 1934, the state district court of Weld county ordered the debtor to further plead in the foreclosure action. The debtor then filed his petition in this court for an order restraining the Central States Life Insurance Company from further proceeding with the foreclosure suit, and requiring it to proceed as a creditor. Upon this petition and the answer of the insurance company the matter is now before the court.

In No. 8068, Charles Francis Cope, it appears that the debtor and his wife, on December 18, 1928, gave their note for $5,000, payable to Carl G. Christoffers, due in five years, secured by a deed of trust to the public trustee of Weld county, Colo., on certain farm land in Weld county. This deed of trust was duly recorded December 31, 1928, and is a first lien on the property. The note being in default a foreclosure suit was filed by Christoffers in the state court on January 26, 1933. The sheriff's certificate of purchase is dated October 27, 1933. The sale was approved June 5, 1934, and deed would have been due under this certificate of purchase July 27, 1934.

On July 25, 1934 Mr. Cope, the debtor, filed his petition and schedules pursuant to subsection (s) of section 75 of the Bankruptcy Act, as amended (11 USCA § 203 (s), and has retained possession of the property. At the time this deed of trust was executed nine months was the period of redemption under our state law.

In addition to attacking the so-called Frazier-Lemke Amendment (11 USCA § 203 (s) on constitutional grounds, the plaintiff Christoffers takes the position "that the sale in foreclosure constituted a satisfaction of the indebtedness." That "from that time there was no relationship of mortgagee and mortgagor, and no relationship of creditor and debtor; that the sole relationship between the parties was a purchaser at a foreclosure sale and a mortgagor with a right of redemption. That the right of redemption was the sole relationship between the parties; that the indebtedness had been cancelled, and that unless the right of redemption was exercised all interest in the property ceased. * * * the only interest of this bankrupt in this particular property was the right of possession for some three or four days at the time this petition was filed." Therefore, it is argued, there was no jurisdiction in bankruptcy.

The consideration of the constitutionality of the present Federal Bankruptcy Act, as amended, may properly start with the constitutional provision, article 1, § 8, cl. 4: "The Congress shall have Power * * * To establish * * * uniform Laws on the subject of Bankruptcies throughout the United States."

This grant of power to the Congress to legislate on the subject is general in its terms, paramount, and unrestricted, International Shoe Co. v. Pinkus, 278 U. S. 261, at page 265, 49 S. Ct. 108, 73 L. Ed. 318, except, as stated in Silverman's Case, Fed. Cas. No. 12,855, the laws passed pursuant thereto shall be uniform throughout the United States. This uniformity is geographical and not personal. Hanover National Bank v. Moyses, 186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113. It includes the power to distribute the insolvent debtor's assets, and what is most important to the present discussion, to discharge him from the demands of his creditors. Hanover National Bank v. Moyses, supra.

Chief Justice Marshall, speaking of the scope of power granted by the eighth section of article 1 of the Constitution, said in Sturges v. Crowninshield, 4 Wheat. 122, at page 195, 4 L. Ed. 529: "The bankrupt law is said to grow out of the exigencies of commerce, and to be applicable solely to traders; but it is not easy to say who must be excluded from, or may be included within, this description. It is, like every other part of the subject, one on which the Legislature may exercise an extensive discretion."

Justice Field, in U. S. v. Fox, 95 U. S. 670, 24 L. Ed. 538, holds that the power delegated to the Congress to establish laws on the subject of bankruptcy may embrace whatever may be determined important to a complete and effective bankrupt system, the object of bankruptcy being to secure ratable distribution of the bankrupt's estate among his creditors, and to relieve him from legal proceedings for his debts upon surrender of his property. It was early held to include the power to declare that part of the debtor's property shall be exempt from the claims of his creditors.

In a very early case, In re Reiman, Fed. Cas. No. 11,675, Judge Hunt said: "Whatever relates to the failure of traders to pay their debts, to the commission of certain acts, or the existence of certain defaults, which shall be evidence of their inability to pay

their debts, to the surrender of their property, and to their discharge from their debts, may well be said to be within the subject of bankruptcies." He further points out that while all proper bankrupt laws are based upon the surrender of the bankrupt's property, none of them require such surrender to be entire and absolute; that: "All civilized nations require that a debtor shall apply his property to the payment of his debts, but few, if any, of them strip him entirely." And that exemptions meet with the approval of all men, and "what shall be the nature and the extent of such exemption must necessarily be within the discretion of the law-making power." See, also, Hanover National Bank v. Moyses, supra. And, of course, in the exercise of this power Congress acts free of any state laws. International Shoe Co. v. Pinkus, supra; Hurley et al. v. Devlin (D. C.) 151 F. 919. That one of the primary objects of bankruptcy legislation is to relieve the honest debtor from legal proceedings for his debts, and securing to him certain exemptions, has always been the law. In re Swofford Bros. Dry Goods Co. (D. C.) 180 F. 549. The fact that Congress has not seen fit in the past to exercise its full power under this constitutional provision does not constitute a valid objection to later amendments that may broaden the scope and effect of the bankruptcy laws. "Where plenary power is given by the Constitution, and Congress sees fit to use only a part of it, that fact will not prevent Congress from exercising the full power whenever it chooses to do so." In re Landquist (C. C. A.) 70 F.(2d) 929, at page 933.

Further, it must be borne in mind that the provisions of the Federal Constitution, art. 1, § 10, cl. 1, forbidding the passage of any law impairing the obligation of contracts, applies only to the states. "Congress, in the exercise of its constitutional right to establish systems of bankruptcy, may, and indeed always does, impair the obligation of contracts." In re Franklin Brewing Co., 249 F. 333 at page 335 (C. C. A. 2d). "It is no answer to this to say that it interferes with the validity of contracts, for no provision of the constitution prohibits congress from doing this, as it does the states; and where the question of the power of congress arises, as in the legal-tender cases, and in bankruptcy cases, it does not depend upon the incidental effect of its exercise on contracts, but on the existence of the power itself." Mitchell v. Clark, 110 U. S. 633, at page 643, 4 S. Ct. 170, 175, 312, 28 L. Ed. 279. Furthermore, the express power granted to Congress by the Constitution to enact bankruptcy laws is not to be regarded as cut down or in any wise diminished by any other provision of the Constitution. As stated in Billings v. U. S., 232 U. S. 261 at page 282, 34 S. Ct. 421, 424, 58 L. Ed. 596: "It is also settled beyond dispute that the Constitution is not self-destructive. In other words, that the powers which it confers on the one hand it does not immediately take away on the other; that is to say, that the authority to tax which is given in express terms is not limited or restricted by the subsequent provisions of the Constitution or the amendments thereto, especially by the due process clause of the Fifth Amendment." In other words, the Constitution cannot be unconstitutional.

And it has been held in Re Rhoads (D. C.) 98 F. 399, that the provision of the Bankruptcy Act providing that all levies and judgments, and other liens, etc., obtained by legal proceedings against an insolvent within four months prior to bankruptcy shall be null and void, does not impair the obligation of existing contracts. See, also, In re Albright (D. C.) 18 F.(2d) 591.

The first bankruptcy statute was enacted in 1800 (2 Stat. 19) and repealed in 1803 (2 Stat. 248). This act covered a very narrow field and afforded no relief to the debtor. The next national bankruptcy act was that of 1841 (5 Stat. 440), containing the provision, new to this branch of the law, for involuntary proceedings. This statute was repealed in 1843 (5 Stat. 614), and there was no national bankruptcy jurisdiction until 1867 (14 Stat. 517). The law of that year, as amended June 22, 1874 (18 Stat. 178), for the first time contained a provision permitting compositions, if approved by three-quarters of the creditors in amount. Compositions, of course, contemplated and amounted to a so-called "scaling down" of the debtor's obligations without the surrender of all his property to his creditors, and without consent of all. In other words, the bankrupt can be discharged of all his debts upon payment of a certain proportion thereof, and retain his estate. This act was repealed in 1878 (21 Stat. 99).

In 1898, twenty years thereafter, Congress enacted the present law, which, with numerous amendments, is still in force. It provides for compositions for which a majority vote of the creditors in number and amount is sufficient, and voluntary and involuntary proceedings. In 1910 (36 Stat. 838) a certain class of corporations were admitted to the benefits of the act.

It appears from this brief review of bankruptcy legislation that prior to the amend-

ments of March, 1933 et seq., compositions, provisions for the scaling down of debts and discharge of bankrupts were contained in one or more of the acts, and that their constitutionality has been sustained.

The Act of March 3, 1933, widened the scope of compositions and brought farmers and railroads within the purview of bankruptcy. Section 75 (tit. 11, § 203 USCA), as amended June 28, 1934 (11 USCA § 203 (s), provides for "agricultural compositions and extensions." Under its terms, a farmer who is insolvent, or unable to meet his debts as they mature, may file a petition asking for a composition or extension of time. The court may, if satisfied the proposal is fair to all, confirm either a composition or an extension proposal, provided it has been accepted by a majority in number of all creditors, and by a majority in amount of secured creditors whose claims are affected. During the pendency of such a proceeding, no suit, etc., may be instituted or maintained in any court against the farmer, or his property, for the recovery of any debt, foreclosure, etc.

Section 75, subsec. (j) (11 USCA § 203 (j), provides that the terms of an extension proposal might extend the time of payment of either or both unsecured debts and secured debts, the security for which is in the actual or constructive possession of the debtor, or of the custodian or receiver, and might provide for priority of payments to be made during the period of extension as between secured and unsecured creditors. It was further provided that the proposal might include specific undertakings by the debtor during the period of the extension, including provisions for payments on account, and might provide for supervisory or other control over the debtor's business or affairs during such period by a creditors' committee or otherwise. Section 75, subsec. (k) (11 USCA § 203 (k), provides that upon its confirmation, an extension proposal should be binding upon the debtor and his unsecured and secured creditors affected thereby. This introduces a moratorium subject to the approval of the court. The payment of not only unsecured indebtedness, but of secured claims as well, may be extended without limit for such time as the court of bankruptcy sees fit, provided only three-quarters of the creditors consent. In other words, a dissenting creditor may be prevented from taking steps to enforce his security, or collect the obligation due him, for an unlimited period of time in the discretion of the court and of his fellow creditors.

These provisions contemplate a scaling down of debts and a postponement of payment without the unanimous consent of creditors, or the surrender by the bankrupt of all his assets. That these provisions are not unique in respect to farmers is shown by section 74 and section 77 (11 USCA §§ 202, 205), extending the same privileges to individuals and railroads.

The Frazier-Lemke Act, approved June 28, 1934, amends section 75, supra. It adds subsection (s) thereto (11 USCA § 203 (s), providing that in the event the farmer fails to obtain the acceptance of his application for composition or extension, or if he feels aggrieved thereby, he may amend his petition or answer and ask to be adjudicated a bankrupt. His property is then appraised "at its then fair and reasonable value, not necessarily the market value," and the farmer may retain possession of his farm, subject to lien to secure all his debts up to the appraised value. Further, he may, with the consent of all the lienholders, buy from his trustee in bankruptcy any part or all of his estate at the appraised value, plus interest and taxes, and pay for the same in installments over a period of six years. This provision requires the consent of all lienholders.

If any secured creditor affected thereby objects to this procedure, the court then shall stay all proceedings for a period of five years, during which time the debtor shall retain all or any part of his property "under control of the court, provided he pays a reasonable rental annually," the first payment of such rental to be paid within six months. At the end of the five years or prior thereto, the debtor may pay into court the appraised price of the property of which he retains possession. Provided, upon the request of any lienholder on real estate, the court shall cause a reappraisal of such real estate and the debtor may then pay the reappraisement price, if acceptable to the lienholder, into court. Otherwise, the original appraisal price may be paid into court, and the debtor becomes entitled to full possession and title to the property and his discharge. The provisions of this act apply only to debts existing at the time the Act became effective. The rental provided for is distributed among the secured and unsecured creditors, as their interests may appear. Section 76 (11 USCA § 204) provides that any extension of debts under section 75 (11 USCA § 203) shall automatically extend the obligation of any person secondarily liable.

The provision for reappraisal at the request of a lienholder of course gives the creditors the benefit of any increase in value accruing within the five year period; an obvious advantage, if we make the reasonable assumption that at the time this act was passed the value of farm property generally was very low. This amendment transfers the liens of secured creditors from the real estate to a fund representing the "fair and reasonable value" thereof. This is not new. Bankruptcy courts have long been vested with the power to sell the property of the bankrupt free and clear of all liens, and to transfer the same to the proceeds of the sale. See In re Franklin Brewing Co., supra, and cases cited. The same is true in some situations arising in equity receiverships.

██ The provision for the five-year stay of proceedings without consent of creditors is not an absolute right. The possession is "under the control of the court," and subject to the payment of reasonable rent and, as we have seen, the creditors receive any increase in the value of the property during the so-called moratorium. This is similar to the railroad bankruptcy provisions, Act of March 3, 1933 (11 USCA § 205), the Corporate Bankruptcy Act of June 7, 1934 (11 USCA § 207), and the provisions of the Act of March 3, 1933 (11 USCA § 202), all of which provide methods by which the bankrupt may retain his property upon making certain provisions for creditors, without the consent of all the creditors. Also similar are the provisions for composition added to the Bankruptcy Act of 1867 by the amendments of 1874, and found in the original Bankruptcy Act of 1898. The court undoubtedly has the power, under this subsection (s), (11 USCA § 203 (s), as well as its broad general equity jurisdiction in bankruptcy, to change the terms of possession and impose such new ones during the moratorium period as may be just to all parties interested.

We know that in equity receiverships in the federal courts more than five years often elapse before a final sale, during which time the creditors are restrained from enforcing liens. Further, that nonassenting creditors are generally forced as a practical matter to accept reorganization plans against their will. The novel feature of this provision (subsection (s) of section 75, 11 USCA § 203 (s), is that the five-year stay is mandatory. It does not, however, contrary to popular belief, provide for a general moratorium on farm mortgages. Furthermore, courts of bankruptcy have always taken possession of the debtor's property, and conducted sales thereof.

The jurisdiction of the bankruptcy court may be invoked only upon a showing of insolvency or inability to pay his debts by an individual petitioner, and now by the recent amendments, by corporations. It is self-evident that creditors in bankruptcy must, as a practical matter, submit to a scaling down of their claims. There is no constitutional or other guarantee that a creditor, secured or unsecured, is entitled as a matter of right to the payment of his full claim. The object of the act from the point of view of the creditors is to marshal and liquidate the debtor's assets, in order that his creditors may receive the largest possible dividends. We cannot shut our eyes to the obvious fact that the creditors have already incurred losses before bankruptcy proceedings are instituted. The proceedings merely minimize and determine the amount, but are not the cause thereof.

Frankly, it is the object of the Frazier-Lemke Amendment to allow the bankrupt to retain his property upon the making of certain payments. A good deal could be said that the possession is as much in the court as the debtor. If this is unconstitutional, then for the same reasons, the Railroad Bankruptcy Act of 1933, the Corporate Reorganization Act, and the act relating to compositions and extensions are likewise; so as far as this point is concerned, all these acts must stand or fall together. But the Supreme Court in Traer v. Clews, 115 U. S. 528, at page 541, 6 S. Ct. 155, 160, 29 L. Ed. 467, had the following to say on this point: "The policy of the bankrupt act was, after taking from the bankrupt all his property not exempt by law, to discharge him from his debts and liabilities, and enable him to take a fresh start. His subsequent earnings were his own. A bankrupt might often desire, out of the proceeds of his exempted property, or out of his means earned since his bankruptcy, to purchase property which he had surrendered to the assignee. This he might do, and there is nothing in the letter or policy of the bankrupt act which forbids his doing so until after his discharge. For, having complied with the law, as it must be presumed he has, he is, after the lapse of six months, entitled, as a matter of course, to his discharge. His right to purchase property surrendered cannot, therefore, depend on his actual discharge, and, in this respect, he stands upon the same footing as any other person."

The procedure under the Frazier-Lemke Act may be different, but fundamentally the question discussed in the above quotation is the same; both permit the bankrupt to keep his property upon making certain payments. Furthermore, the price that the debtor pays for his property under "seven" of subdivision (s), 11 USCA § 203 (s) (7) is not finally determined until the end of the five year period; so there can be no impairment until that time; and the Act is meticulous in requiring the court's approval of every step in the procedure.

Finally, we must not overlook the importance of section 78 (11 USCA § 301), a solemn declaration of policy by the Congress that a national emergency exists, which renders imperative the further exercise of the bankruptcy powers of the Congress. The Supreme Court has said in the Minnesota Case, Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 239, 78 L. Ed. 413, 88 A. L. R. 1481, that while Congress cannot create powers, it can, under an emergency, exercise powers that have heretofore lain dormant. It is not for the court to question this declaration by Congress, which may be said to be an exercise of the broad police power vested in the federal government, and which exists independent of bankruptcy.

The Minnesota Case, supra, dealt with the rights of the state to impair contracts, but Justice Hughes in concluding his opinion observed that what was said on that point is also applicable to the contention there presented under the due process clause of the Federal Constitution, and which is so ably pressed here by counsel. He went on to say that the state continues to possess authority to safeguard the vital interests of its people, and it does not matter that legislation appropriate to that end, "has the result of modifying or abrogating contracts already in effect." Citing Stephenson et al. v. Binford et al., 287 U. S. 251, 53 S. Ct. 181, 77 L. Ed. 288, 87 A. L. R. 721. And, page 435 of 290 U. S., 54 S. Ct. 231, 239: "Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."

In the Chilton case the point is pressed that while Chilton took the property subject to the mortgage, he is not directly obligated, and the holder of the note is not a creditor and not subject to the Bankruptcy Act. The stay authorized by section 75 (o), 11 USCA

§ 203 (o), however, applies not only to personal actions against the farmer, but is an in rem proceeding to the extent that it applies specifically to his property. In the Cope case, No. 8068, it is contended that the sale and foreclosure constituted a satisfaction of the indebtedness, and that from that time the relation of creditor and debtor ceased to exist, and that Cope had no interest in the property, other than the right to redeem. Under the laws and decisions of Colorado, Moncrieff v. Hare, 38 Colo. 221, 87 P. 1082, 7 L. R. A. (N. S.) 1001, and Plains Loan, Realty & Investment Co. v. Hood, 76 Colo. 323, 230 P. 1008, it is held that when the mortgagee at the foreclosure sale bids and pays the full amount of the debt and costs, etc., surrenders and cancels the note and mortgage and takes the trustee's certificate, the transaction constitutes a payment in full of the mortgage indebtedness, in the event only the mortgagor fails to redeem.

In conclusion, I am of the opinion that while the so-called Frazier-Lemke Act goes further than any provisions of the Bankruptcy Act existing at the time of its enactment, that it is within the bankruptcy clause of the Federal Constitution. This power is plenary and unlimited, and cannot be destroyed by other provisions or amendments of the Constitution.

We express no opinion on other questions raised in the argument and briefs not necessary to a decision of the cases before us.

Orders agreeable to these views may be presented.